## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JUAN C. ROMAN,

     Plaintiff,

     v.

BIMBO BAKERIES USA, INC.,

     Defendant.

Case No. 5:24-CV-04032-JAR

## MEMORANDUM AND ORDER

Plaintiff Juan Roman brings this action against his former employer, Defendant Bimbo Bakeries USA, Inc., alleging race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Kansas Act Against Discrimination ("KAAD"). This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 37). The motion is fully briefed, and the Court is prepared to rule. For the reasons explained below, the Court grants in part and denies in part Defendant's motion.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3] A fact is "material" if, under

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The non-moving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the non-moving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the non-movant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."[10]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

---

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[10] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citations omitted).

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## II.    Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the non-moving party.[13]

### A.  Background and Workplace Policies

Defendant manufactures, sells, and distributes various fresh-baked goods under a variety of brand names and operates bakeries across the United States, including in Topeka, Kansas. Defendant hired Plaintiff, who identifies as Hispanic, to work in Defendant's Topeka facility in September 2014 as a production associate.  Production associates at the Topeka facility are represented by BCTGM Local 218 (the "Union").

Throughout Plaintiff's employment, Defendant maintained written policies prohibiting harassment and discrimination on the basis of race and prohibiting unlawful retaliation.  Plaintiff acknowledged receipt of those policies when he was hired.  Plaintiff also received and acknowledged Defendant's written attendance policy, described as a traditional "no fault" point policy.[14]  The attendance policy provides that an associate may be subject to termination if they accrue eight points in a rolling twelve-month period, and it distinguishes between "excused" and

---

[13] Defendant objects to many of Plaintiff's responses to Defendant's statements of fact, arguing that Plaintiff improperly attempts to add to or clarify facts by citing additional evidence after admitting the facts are uncontroverted.  The Court agrees and generally disregards factual assertions and record citations offered solely to supplement admitted facts, particularly where those assertions do not appear in either Defendant's statements of fact or Plaintiff's own statement of facts.  *See* D. Kan. Rule 56.1(a), (b)(2) (providing that "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party," and that "[i]f the party opposing summary judgment relies on any facts not contained in movant's brief, that party must set forth each additional fact in a separately numbered paragraph").

Additionally, in responding to Defendant's motion for summary judgment, Plaintiff filed Doc. 44, a single, 281-page document containing all thirty of Plaintiff's exhibits.  The Court directs Plaintiff's counsel to review this Court's Summary Judgment Guidelines, which explain that "[e]xhibits attached to summary judgment briefs should be clearly and adequately described when they are entered in the CM/ECF system.  [E.g., Attachments: #1 Index of Exhibits, #2 Exhibit A - Bill Smith Affidavit].  This allows the court to easily locate them when they are cited." United States District Court for the District of Kansas, Summary Judgment Guidelines, https://ksd.uscourts.gov/file/326 (Feb. 24, 2023).

[14] Doc. 36 at 3 (Pretrial Order Stipulations ¶ 2.a.IX).

"unexcused" absences.[15]  Excused absences are not subject to point accumulation, and only unexcused absences are managed through the point system.  Associates may ask a manager for their attendance point total at any time.

Defendant's Topeka facility operates four shifts: first, second, third, and fourth.  The third and fourth shifts overlap by approximately 2.5 hours.  In 2018, Plaintiff was assigned to the sanitation department, which is the fourth shift.  At all relevant times, Jerry Allen ("Manager Allen") served as the fourth shift manager, and beginning in 2021, Josh Henning ("Supervisor Henning") served as the fourth shift supervisor.

On October 7, 2020, Plaintiff received live training on and copies of Defendant's "Respect in the Workplace," "Equal Employment and Affirmative Action," and "Complaints and Investigations" policies.[16]  Those policies include a complaint mechanism instructing associates to report potential policy violations, including discrimination and retaliation, to management, human resources, or Defendant's toll-free hotline.

## B.  Defendant's Investigation of the Fourth Shift's Break Use

Associates at Defendant's Topeka facility are entitled to take a 30-minute unpaid lunch break.  The Union contract governs associate break times and does not specify a particular time when associates must take their breaks.

On March 21, 2022, Supervisor Henning began investigating whether two fourth shift associates, Ryland Patton and Cindi Scheibe, were taking excessive breaks.  On March 23, 2022, Supervisor Henning provided Anne Hall, the facility's human resources generalist, with three days of time-tracking information indicating Patton was taking excessive breaks.  That same day,

---

[15] *Id.* (Pretrial Order Stipulations ¶ 2.a.XII).

[16] *Id.* (Pretrial Order Stipulations ¶ 2.a.VIII).

Hall spoke with Patton, who admitted he took excessive breaks and stated that the entire fourth shift was taking excessive breaks. Hall then expanded her investigation to review the break usage for the entire fourth shift.

On March 24, 2022, Scheibe reported to Manager Allen that she could not locate Plaintiff and Joshua Jenkins and believed they had been off the shop floor for over an hour. In response, Manager Allen pulled up Plaintiff and Jenkins on camera, monitored them, and then called them into his office to inform them they were being placed under investigation. Hall's investigation report reflects that video footage showed Plaintiff and Jenkins taking an hour-long lunch, 30 minutes beyond the permitted 30-minute lunch break, and that the footage showed them hiding in the locker room, clocking out for lunch, clocking back in, and returning to the locker room before going back to the shop floor.

During Hall's break-use investigation, Patton and Jenkins told Hall that they thought race was dividing the fourth shift, and Hall responded that she was investigating the entire shift. Consistent with those concerns, on March 29, 2022, Brenda McConnaughey, a production associate, submitted a written statement to Defendant's human resources department describing that the "4th team is no longer a team" and that the shift was divided by "accusations, innuendos, [and] implied threats."[17] McConnaughey noted that the break times of Patton, Jenkins, Ebony Haase, and Plaintiff were being questioned, and she described team members as feeling singled out, victimized, and racially profiled. McConnaughey also wrote that another production associate, Brian Talbert Marshall, was "provoking" Plaintiff because "Trump was firm on building the wall."[18] McConnaughey's statement further reflects that she raised these concerns

---

[17] Doc. 44 at 236.

[18] *Id.* at 238.

with Manager Allen, Supervisor Henning, and the Union steward, Jon Wilson ("Steward Wilson").  Hall did not investigate race-related issues as part of the break-use investigation.

At the conclusion of Hall's investigation, Hall and Supervisor Henning determined that the following fourth shift associates violated Defendant's break policy on March 21, 2022, and each received a documented verbal warning on April 6, 2022: Plaintiff, Rose McCall, Jenkins, Nicole Sullivan, Chase Cramer, Scheibe, and Patton.  Hall concluded that Jenkins took the most excessive breaks of the seven associates, but nonetheless received the same documented verbal warning as the others.  Neither the Union nor any associate who received a documented verbal warning on April 6, 2022 filed a grievance.

Hall also learned during her investigation that Manager Allen had been giving Scheibe additional and more flexible break time to care for her grandchildren, and Hall instructed Manager Allen to cease allowing that accommodation.

### C.  The May 4 Letter

On or about May 4, 2022, Katlyn Anderson, a production associate, submitted a letter to Defendant (the "May 4 Letter") signed by herself and seven other fourth shift associates: Haase, Terrell Alexander, McConnaughey, Alejandro Llamas, Cramer, Patton, and Plaintiff.  In the letter, the signees alleged they were targets of discriminatory and harassing conduct by four co-workers: Brian Talbert Marshall ("Talbert"), Christy Marshall ("Christy"), Drora Neff, and Scheibe.  The letter alleged the following:

> In Sanitation there has been a lot of "hostile" work environment like RACEISM [sic] . . . . Incidences such as watching the only minorities on the team from a distance.  Then complaining about said minorities to upper management in hopes of getting them into trouble.  In one[] case[,] abusing a potential "FAD" title to cause conflict.  In another's case[,] using politics and religious beliefs to degrade

said individuals . . . . Just because they are white don[']t make it right to belittle someone![19]

In addition to submitting the May 4 Letter, Anderson submitted a complaint to Defendant's "Speak Up" hotline on May 4, 2022, which was emailed that day to Jose Lemus, a human resources manager, and Hall.[20]  In her complaint, Anderson stated that Scheibe, Christy, Talbert, and Neff were creating a hostile work environment based on racism and discrimination. Anderson also stated that those individuals claimed Patton, Terrell Alexander, Plaintiff, Haase, Llamas, Cramer, McCall, and McConnaughey were "not in their work area" in order to get them in trouble.[21]

Anderson further stated that Christy requested that Patton and Plaintiff not help her, and then later complained that they did not help her.  Anderson also reported that Talbert stated, "[i]f you don't like my political views, my white brothers and I will handle the situation," and "[t]his is white man's land before anybody else's land."[22]  Anderson further stated that Talbert was part of an activist group he called his "white brothers."[23]

Anderson also stated that she had previously reported the conduct of Scheibe, Christy, Talbert, and Neff to Manager Allen and Supervisor Henning, but the situation had not changed. Anderson further alleged that Scheibe, Christy, Talbert, and Neff also created a hostile work environment for Cramer, McCall, and McConnaughey because those employees were friends with Patton, Alexander, Plaintiff, Haase, and Llamas.

---

[19] Doc. 38-16 at 2–3.

[20] Doc. 44 at 228–31.

[21] *Id.* at 230.

[22] *Id.*

[23] *Id.* at 230–31.

In response to the May 4 Letter and the Speak Up complaint, Hall opened an investigation. Hall interviewed all eight associates who signed the May 4 Letter, as well as Christy and Scheibe. Hall also spoke with Steward Wilson and Manager Allen. During the interviews, Hall either took handwritten notes or asked the interviewee to prepare a handwritten statement.

Hall's handwritten notes from her interview with Anderson reflect that Anderson told Hall that Christy, Talbert, Scheibe, and Neff had formed a clique, that it "feels like the 4 are forming a group against others," and that "[t]hey are telling on everybody else."[24] Anderson also reported that, on April 30, 2022, Plaintiff was on vacation, but his time off was not reflected on the calendar. Anderson stated that, because of this, Scheibe and Christy went to Manager Allen to try to "make [Plaintiff] get a point" and were upset when Plaintiff was not fired.[25]

Anderson further alleged that Scheibe had been hazing Llamas by not telling him the Sunday schedule, which required a 4 A.M. to 4 P.M. shift rather than 6 A.M. to 6 P.M., and then "got onto" Llamas when he arrived at 6 A.M., telling him he would "get points for not being there" at 4 A.M.[26] Anderson also stated that Scheibe called the Union to try to get Steward Wilson "in trouble" for "not doing his job" and "picking sides," and that Anderson had communicated these concerns to Supervisor Henning when she returned from leave in March 2022 and had also communicated them to Manager Allen.[27]

Hall's handwritten notes from her interview with McConnaughey reflect that McConnaughey told Hall that Talbert and Christy bent the rules by using the Union contract to

---

[24] *Id.* at 249.

[25] *Id.*

[26] *Id.* at 251.

[27] *Id.* at 249, 252.

get out of audits.  McConnaughey stated that Manager Allen set the audit schedule, but Talbert and Christy came in early and left early before the auditors arrived.  McConnaughey also reported that Christy and Scheibe talked about Plaintiff's attendance points and that McConnaughey felt they were "passing judgment."[28]  McConnaughey described Talbert as "prejudice" in connection with "political issues," explaining that he "becomes combative" if someone does not agree with him.[29]  McConnaughey further stated that Talbert and Russell Gibson, a production associate, had been friends, but after a political disagreement Talbert told Gibson to "meet him after work," and that Talbert's "brotherhood of friends would handle it."[30] In McConnaughey's deposition, she testified that Talbert drove a truck to the Topeka facility with an American flag affixed on one side and a Confederate flag affixed on the other. McConnaughey also testified that, on one occasion in 2018, Talbert brought a firearm to work and was "waving it around at lunch."[31]

In Haase's handwritten statement, she stated that Christy had been walking past Haase's work area more frequently than usual and would stop briefly to watch what Haase was doing, and that Neff questioned Haase about when Haase arrived at work and when she left for lunch.

In Cramer's handwritten statement, Cramer stated that once he befriended Patton and Plaintiff, Talbert stopped training Cramer even though Cramer was not ready to work on his own, and that Talbert told him he needed to watch who he hung out with.  Cramer also stated he

---

[28] *Id.* at 253.

[29] *Id.* at 254.

[30] *Id.*

[31] *Id.* at 96 (McConnaughey Dep. 33:18–25).

witnessed Christy ask Scheibe if she wanted to report Haase and that the two agreed on a plan to "tell on [Haase]" to Manager Allen.[32]

Hall's handwritten notes from her interview with Llamas reflect that Llamas told Hall that Scheibe and Christy acted as if they were managers or supervisors, watched other team members, and seemed to be "spying" in order to "tattle" on other associates to Manager Allen, and he stated it "feels like [Scheibe and Christy] only watch people of color."[33]

Hall's handwritten notes from her interview with Patton reflect that Patton told Hall that he overheard Manager Allen tell Scheibe that he was "trying to save [her]" in connection with the March 2022 break-use investigation, and Patton also stated that Scheibe continued to take excessive breaks even after the March 2022 write-ups.[34]

Hall's handwritten notes from her interview with Scheibe reflect that Scheibe stated that Plaintiff "makes comments when he is upset—he blames it on his brown skin."[35]

During Hall's interview with Plaintiff, Plaintiff told Hall that he felt Neff would "throw him under the bus," that Neff was rude to him when he was training her, and that she had something against him.[36]  Plaintiff also stated that Christy promoted a negative attitude and watched others to report them, and that Plaintiff did not think Christy was an effective union steward because her husband worked on the shift.  Plaintiff did not mention Scheibe in his interview other than to note that Scheibe asked him who he voted for in the 2020 presidential election.  Plaintiff further stated that, around the time of the 2020 presidential election, Talbert

---

[32] *Id.* at 263.

[33] *Id.* at 264.

[34] *Id.* at 260.

[35] *Id.* at 259.

[36] *Id.* at 258.

also asked him whom he had voted for or planned to vote for.  Plaintiff responded that he was not supporting President Donald Trump because he believed Trump was racist.  Talbert then asked Plaintiff whether he believed Talbert was racist.

Plaintiff also reported to Hall that Talbert told Plaintiff he should pay for Talbert's gas because of Plaintiff's political vote and that Talbert made comments about being part of a "brotherhood."[37]  Plaintiff further described an incident from several years earlier in which Talbert asked Gibson to "go outside" after a disagreement.[38]  In deposition testimony, Plaintiff later testified that Talbert told him that Plaintiff should have to pay for the border wall, but Plaintiff did not report that statement to Defendant.  Plaintiff also testified that Talbert had personal disagreements "with mostly everybody."[39]

Hall completed her investigation in late May 2022 and concluded there was insufficient evidence to substantiate that Talbert, Christy, Neff, and Scheibe engaged in the conduct alleged by the May 4 Letter signees on the basis of race.  Hall nevertheless determined that there were instances of unprofessional and non-cooperative conduct across the fourth shift and submitted her findings to Jose Lemus for review.  In early June 2022, the fourth shift was verbally instructed that associates needed to work together professionally and cooperatively.  Talbert was on approved leave from April 7, 2022 through June 18, 2022.  When Talbert returned from leave in late June 2022, Hall met with him and instructed him to behave professionally and cooperatively with his peers.

After the May 4 Letter, Plaintiff continued to encounter the co-workers identified in the complaints at work.  Specifically, Plaintiff encountered Christy between May 23, 2022 and July

---

[37] *Id.* at 257.

[38] *Id.*

[39] Doc. 38-3 at 36 (Plaintiff Dep. 314:23–24).

31, 2022; Scheibe between August 24, 2022 and September 10, 2022; and Talbert between June

18, 2022 and July 9, 2022 and again between July 22, 2022 and July 31, 2022.  However, after

the May 4 Letter, neither Plaintiff nor any other associate made additional reports to Defendant

of racially motivated behavior by Talbert, Christy, Scheibe, or Neff toward Plaintiff or anyone

else.  Talbert and Patton were terminated in late July 2022.  Neff resigned on May 16, 2022, and

Christy resigned on August 10, 2022.  Anderson, Haase, Alexander, McConnaughey, and

Llamas, all signers of the May 4 Letter, either voluntarily resigned their employment or remain

employed by Defendant.  Cramer accrued eight attendance points in May 2023 and was

terminated on May 31, 2023.

In November 2022, McConnaughey witnessed Enrique Estrella, a supervisor, tell

Plaintiff and Martin Marciel, a production associate, that they were "lazy spics."[40] Plaintiff and

Marciel, along with Steward Wilson, reported the comment to Manager Allen shortly thereafter.

According to McConnaughey, Estrella apologized, and it did not happen again.

### D.  Plaintiff's Attendance Violations

In February 2017, Plaintiff received his only performance review.  In that review,

Plaintiff's then-supervisor, Patrick Johnson, rated him overall "effective" and noted that Plaintiff

understood his job, put good effort into his work, and had "no issues with attendance."[41]  Later,

in 2020 and 2021, Plaintiff received four formal corrective actions under Defendant's attendance

policy, including a final written warning in May 2021.  On February 28, 2022, Supervisor

Henning issued Plaintiff a written attendance warning notifying him that he had accrued five

attendance points and identifying the dates and points accrued.  Each attendance warning

---

[40] Doc. 44 at 110 (McConnaughey Dep. 86:25–87:2).

[41] *Id.* at 233.

reminded Plaintiff that he could accrue only eight points in a twelve-month period and that accruing eight points could result in termination.  Plaintiff did not contest, challenge, or grieve the accuracy of the 2020–2021 corrective actions or the February 28, 2022 warning.

During this period, the fourth shift work schedule was not consistently posted in advance. At times, Manager Allen did not timely post updated schedules, older schedules remained posted, and the posted schedule did not always reflect associates' actual working hours.  This practice caused confusion about scheduled hours and contributed to attendance issues.

In May 2022, Plaintiff had accumulated 5.5 attendance points.  That same month, Defendant asked Plaintiff to temporarily transfer to the third shift to cover staffing needs and train five newly hired Spanish-speaking employees, and Plaintiff agreed.  Plaintiff received an additional $1.00 per hour when assisting with that training.  From May 23, 2022, through September 10, 2022, Plaintiff worked on the third shift.  During that period, Plaintiff requested and was approved for leave under the Family and Medical Leave Act from July 31 to August 23, 2022.  Thereafter, from October 23 through October 26, 2022, Plaintiff worked shifts other than the fourth shift to cover staffing needs.  Beginning in late spring 2022, Supervisor Henning was also temporarily transferred to another shift due to staffing needs.

On or about October 19 or 20, 2022, Plaintiff approached Manager Allen and asked about his total attendance-point accrual.  Manager Allen then reviewed the attendance tracker for the associates under his supervision and determined that Plaintiff had accrued more than eight attendance points.  Manager Allen informed Plaintiff that, based on his attendance-point accrual, he was subject to termination.  Manager Allen's review also showed that another probationary employee, Isiah Holz, had accumulated more than the maximum number of attendance points

permitted during the probationary period.  Before conducting this review, Manager Allen was unaware that Plaintiff had accumulated eight or more attendance points.

Manager Allen directed that Holz be suspended pending management and human resources review of his attendance.  Rather than suspending Plaintiff and forwarding his attendance for review, Manager Allen consulted with Hall, and they decided to give Plaintiff another chance by issuing a final written warning.  On November 1, 2022, Manager Allen met with Plaintiff and issued him a final written warning stating that Plaintiff had accrued nine attendance points and listing the dates on which the points were assessed.  Steward Wilson was present at the meeting, and Plaintiff had an opportunity to confer with Wilson.  Plaintiff protested the points Defendant claimed he had accrued, but he does not specify which dates in the November 1, 2022 final written warning he believed were inaccurate.  Plaintiff was most adamant about a different written warning he received in June 2022, which he asserts contained discrepancies, including a signature that was not his.  Other than the signature, Plaintiff does not identify any additional discrepancies regarding the June 2022 written warning.

The November 1, 2022 warning noted that several of Plaintiff's attendance points would roll off in January and February 2023, so long as Plaintiff did not incur additional attendance violations.  After receiving the November 1, 2022 final written warning, Plaintiff worked his normal fourth-shift schedule from November 1, 2022, through December 6, 2022.  On December 7, 2022, Plaintiff called Defendant more than an hour after the start of his shift and stated that he had overslept.  Defendant suspended Plaintiff pending review of his attendance.  On December 9, 2022, Hall prepared a termination recommendation form and circulated it to plant manager Lopez Velencia and corporate human resources personnel Jose Lemus and Elizabeth Rios.  In preparing the termination recommendation form, Hall did not review Plaintiff's timekeeping

records or otherwise investigate the accuracy or validity of Plaintiff's attendance points. Velencia, Lemus, and Rios reviewed Plaintiff's attendance history and decided to terminate Plaintiff, and Plaintiff was notified of his termination on December 15, 2022.  After Plaintiff's separation, Defendant hired two individuals to join the fourth shift, and both remain employed by Defendant.

On February 2, 2023, Plaintiff filed a charge of discrimination, which was dually filed with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission ("KHRC").  The EEOC issued Plaintiff a Notice of Right to Sue on January 24, 2024.

### III.    Analysis

Plaintiff asserts identical claims under Title VII and the KAAD for race discrimination (Count I), hostile work environment (Count II), and retaliation (Count III).  Because the same standards and burdens apply to claims under Title VII and the KAAD, the Court's analysis applies equally to Plaintiff's Title VII and KAAD claims.[42]  Defendant moves for summary judgment on all three claims, and the Court addresses each claim separately below.

### A.  Count I – Race Discrimination

In Count I, Plaintiff alleges that Defendant discriminated against him on the basis of race when it terminated his employment.  Title VII makes it unlawful for an employer to discharge or discriminate against an employee based on his race, color, religion, sex, or national origin.[43]  A plaintiff can prove a Title VII claim through "either direct evidence of discrimination or indirect

---

[42] *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) ("[W]e apply the same analysis to the Title VII and KAAD claims.").

[43] 42 U.S.C. § 2000e-2(a).

evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*."[44] Here, Plaintiff offers no direct evidence of race-based discrimination. The Court therefore evaluates Plaintiff's claim under the *McDonnell Douglas* framework. Under this framework, "[P]laintiff has the burden of presenting a prima facie case of discrimination."[45] If Plaintiff meets his initial burden, then the burden shifts to Defendant to "articulate a legitimate, non-discriminatory reason for its actions."[46] If Defendant meets its burden, then the burden shifts back to Plaintiff to "prove the employer's articulated reasons are pretextual."[47]

### 1. Prima Facie Case

To establish a prima facie case of Title VII discrimination, a plaintiff who is a member of a protected class must show that he experienced an adverse employment action "under circumstances which give rise to an inference of unlawful discrimination."[48] In wrongful termination cases, such as this one, a plaintiff may raise an inference of unlawful discrimination by showing that: "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge."[49]

Defendant does not dispute that Plaintiff can satisfy the first, third, and fourth elements of his prima facie case. Defendant argues, however, that Plaintiff cannot satisfy the second element because he was not "qualified" for his position in light of his attendance record and the accrual of attendance points under Defendant's no-fault attendance policy. However, Plaintiff's burden

---

[44] *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[45] *Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1334 (10th Cir. 2025) (quoting *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021)).

[46] *Id.* (quoting *Throupe*, 988 F.3d at 1251).

[47] *Id.* (quoting *Throupe*, 988 F.3d at 1251).

[48] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000).

[49] *Id.* at 1229; *see also Walkingstick Dixon*, 125 F.4th at 1335.

at the prima facie stage is "not a heavy one."[50]  In fact, the Tenth Circuit has held that a plaintiff may "demonstrate [his] satisfactory performance simply by insisting that [he] was performing satisfactorily."[51]  Furthermore, "[t]he relevant inquiry at the prima facie stage is not whether an employee . . . is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that [he] possesses the objective qualifications *necessary to perform the job sought*."[52]

Applying that standard here, Plaintiff meets his prima facie burden.  Plaintiff worked for Defendant for more than eight years before his termination.  The record reflects that Plaintiff received only one performance review during his employment, and in that February 2017 review, his supervisor rated him overall "effective" and noted that Plaintiff understood his job and put good effort into his work.[53]  Plaintiff also points to evidence that Defendant selected him to temporarily transfer to the third shift to cover staffing needs and assist with training newly hired Spanish-speaking employees.  On this record, Plaintiff has produced sufficient evidence of the basic qualifications necessary to perform his production-associate role.  Defendant's argument that Plaintiff was not qualified because his attendance points made him subject to termination under Defendant's policy is more appropriately addressed at the later stages of the *McDonnell Douglas* analysis rather than used to defeat Plaintiff's prima facie case.[54]

---

[50] *Brainerd v. Schlumberger Tech. Corp.*, 589 F. App'x 406, 410 (10th Cir. 2015).

[51] *Id.*

[52] *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000).

[53] Doc. 44 at 233.

[54] *See Horizon/CMS Healthcare Corp.*, 220 F.3d at 1194.

### 2. Legitimate, Non-Discriminatory Reason for Termination

Because Plaintiff has established a prima facie case of race discrimination, Defendant must articulate some legitimate, non-discriminatory reason for terminating Plaintiff's employment.[55]  Defendant's burden at this stage is "exceedingly light," and Defendant's "stated reasons need only be legitimate and non-discriminatory 'on their face.'"[56]  Defendant asserts that it terminated Plaintiff because he violated its no-fault attendance policy by accruing more than the maximum number of attendance points permitted in a rolling twelve-month period.  This explanation is legitimate and nondiscriminatory on its face.  Defendant has therefore met its burden at the second step of the *McDonnell Douglas* framework.

### 3. Pretext

Lastly, to survive summary judgment, Plaintiff must create a genuine issue of material fact as to whether Defendant's reason for terminating his employment was pretextual.[57]  A plaintiff may show pretext by demonstrating the "proffered reason is factually false," or that "discrimination was a primary factor in the employer's decision."[58]  This is often accomplished by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason."[59]

---

[55] *Walkingstick Dixon*, 125 F.4th at 1335.

[56] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017).

[57] *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013).

[58] *Id.*

[59] *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002) (alteration in original) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

Plaintiff argues Defendant's proffered reason is false. In support of his pretext showing, Plaintiff submits several weekly work schedules that list the hours employees were scheduled to work. Plaintiff points to schedules indicating that he was marked as on vacation or scheduled to be off on two of the dates listed in his November 1, 2022 final written warning, even though he incurred attendance points on those dates, including one point for calling in and half a point for clocking in late. Defendant responds that the schedules are immaterial because Plaintiff testified that the schedules were unreliable. Specifically, Plaintiff testified that the schedules were "how you would be aware of what hours you worked," but it was "subject to change at any time."[60] Plaintiff explained that "it was a big issue, because you could see the schedule in the morning, and it would have different times."[61] Plaintiff further testified that this would "cause a lot of conflict," because "a lot of times[,] Jerry didn't—was not—would not update these every day, every week."[62]

At summary judgment, the Court cannot resolve the parties' dispute about the reliability of the schedules or draw credibility-based inferences from that evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[63] Viewing the evidence in the light most favorable to Plaintiff, the weekly work schedules, together with his testimony regarding how schedules were posted and updated, create a genuine dispute about whether Plaintiff in fact accrued the points attributed to him on the dates identified in the November 1, 2022 final written warning and, in turn, whether Defendant's explanation that Plaintiff was terminated for violating the

---

[60] Doc. 44 at 81 (Plaintiff Dep. 317:1–3).

[61] *Id.* (Plaintiff Dep. 317:4–6).

[62] *Id.* (Plaintiff Dep. 317:22–24).

[63] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

attendance policy is worthy of belief.  Accordingly, Defendant's motion for summary judgment on Count I is denied.

### B.  Count II – Racially Hostile Work Environment

In Count II, Plaintiff alleges that Defendant subjected him to a racially hostile work environment.  Defendant moves for summary judgment on this claim on two grounds: (1) Plaintiff relies on incidents learned only through discovery and not known to him during the period he alleges he experienced a hostile work environment; and (2) when the Court limits its consideration to conduct Plaintiff personally experienced or contemporaneously knew about, Plaintiff's claim is untimely because he has not identified any act contributing to the alleged hostile work environment that occurred within the 300-day charging period.  The Court addresses these issues in sequence.

First, the Court determines the proper scope of the hostile work environment claim by considering only conduct Plaintiff experienced or knew about at the relevant time.  The Court then evaluates timeliness—whether at least one act falls within the limitations period and, if so, whether the earlier incidents Plaintiff identifies are sufficiently related to the timely act to constitute the same unlawful employment practice.  Finally, after determining the scope of any timely hostile work environment, the Court addresses whether the remaining conduct is sufficiently severe or pervasive to support Plaintiff's claim.

#### 1.  Experiences of Other Employees

In evaluating the scope of Plaintiff's hostile work environment claim, the Court considers "only evidence of comments or conduct relating to harassment of which plaintiff was *aware* during the time that he was allegedly subjected to a hostile work environment."[64]  In other words,

---

[64] *Frazier v. GPI KS-SH, Inc.*, No. 19-2020-JWL, 2020 WL 2523290, at *9 n.6 (D. Kan. May 18, 2020) (emphasis added) ("[T]he court disregards certain evidence in the record from other employees about [the alleged

Plaintiff cannot establish a claim for hostile work environment and survive summary judgment by relying upon incidents that he did not have contemporaneous knowledge of at the time he allegedly experienced the hostile work environment.

Here, in his summary judgment response, Plaintiff identifies a list of incidents that he contends support his racially hostile work environment claim.[65]  Defendant responds that many of the incidents Plaintiff cites are drawn from other employees' complaints, interview statements, or deposition testimony, and that Plaintiff has not shown he was aware of those incidents during the period he alleges he experienced a hostile work environment.  Consistent with the governing standard, the Court addresses each incident below and determines whether it reflects conduct Plaintiff contemporaneously knew about and experienced.

- Plaintiff first identifies an excerpt from McConnaughey's March 29, 2022 written statement, which describes that Patton, Jenkins, Haase, and Plaintiff's break times were being questioned.  Plaintiff has sufficiently established his contemporaneous awareness of this incident.  The record reflects that Supervisor Henning informed Plaintiff on March 24, 2022, that he was under investigation for his break usage and that Plaintiff received a documented verbal warning on April 6, 2022, at the conclusion of the investigation.  The Court therefore considers this incident as part of Plaintiff's hostile work environment claim.

---

harasser's] conduct because plaintiff has failed to produce evidence indicating that he himself had knowledge of that conduct during his employment."); *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1146 (10th Cir. 2008) ("Evidence of a general work atmosphere, including evidence of harassment of other racial minorities, may be considered in evaluating a claim, as long as [plaintiff] presents evidence that [s]he knew about the offending behavior." (citation modified)); *Doe v. Hutchinson*, 728 F. App'x 829, 833 (10th Cir. 2018) ("[Plaintiff] may rely on evidence that [the alleged harasser] directed gender-based comments to other students to help establish a general atmosphere of harassment provided she was aware of such conduct." (citation modified)).

[65] Doc. 42 at 32.

- Plaintiff also relies on another portion of McConnaughey's March 29, 2022 written statement, which reports that Talbert was "asking [Plaintiff] about his political views" and "asking him about who he voted for," and that Talbert was "provoking" Plaintiff because "Trump was firm on building the wall."[66]  This incident, as described in McConnaughey's statement, involves Talbert's comments directed at Plaintiff and therefore reflects conduct Plaintiff would have contemporaneously experienced.  The Court therefore considers this evidence as part of Plaintiff's hostile work environment claim.

- Plaintiff next cites a segment of Anderson's May 4, 2022 Speak Up complaint, which asserts that Scheibe, Christy, Talbert, and Neff claimed that Patton, Alexander, Plaintiff, Haase, Llamas, Cramer, McCall, and McConnaughey were "not in their work area" in order to get them in trouble.[67]  Plaintiff cites no evidence showing that he had contemporaneous knowledge that Scheibe, Christy, Talbert, or Neff made these allegations during the period he claims he experienced a hostile work environment.  The Court therefore does not consider this incident in evaluating Plaintiff's hostile work environment claim.

- Plaintiff cites another excerpt from Anderson's May 4, 2022 Speak Up complaint, which asserts that Christy requested that Patton and Plaintiff not help her, and then later complained that they did not help her.  Plaintiff cites no evidence identifying who Christy allegedly complained to, whether the complaint was made to Plaintiff or to management, and if so, whether Plaintiff was contemporaneously aware of the

---

[66] Doc. 44 at 238.

[67] *Id.* at 230.

alleged complaint. The Court therefore does not consider this incident as part of Plaintiff's hostile work environment claim.

- Plaintiff references another portion of Anderson's May 4, 2022 Speak Up complaint, which asserts that Talbert stated, "[i]f you don't like my political views, my white brothers and I will handle the situation," and "[t]his is white man's land before anybody else's land," and that Talbert was part of an activist group he called his "white brothers."[68] Plaintiff cites no evidence showing who these statements were made to or that Plaintiff contemporaneously knew of them during the period he alleges he experienced a hostile work environment. The Court therefore does not consider this incident as part of Plaintiff's hostile work environment claim.

- Plaintiff relies on his own deposition testimony and Hall's handwritten notes from her interview with him, in which Plaintiff explained that Talbert (1) made comments about being part of a "brotherhood";[69] (2) told Plaintiff he should pay for Talbert's gas because of Plaintiff's political vote; (3) told Plaintiff that Plaintiff should have to pay for the border wall; and (4) told Gibson "let's go outside" after a disagreement.[70] Because these statements are drawn from Plaintiff's own account of Talbert's comments, they reflect conduct Plaintiff would have contemporaneously experienced and been aware of. The Court therefore considers this evidence as part of Plaintiff's hostile work environment claim.

---

[68] *Id.* at 230–31.

[69] *Id.* at 257.

[70] *Id.*

- Plaintiff next identifies an allegation from Anderson's May 4, 2022 Speak Up complaint, which stated that on April 30, 2022, Plaintiff was on vacation, but it was not marked on the calendar, and that Scheibe and Christy went to Manager Allen to "make [Plaintiff] get a point" and were upset when Plaintiff was not fired.[71]  Plaintiff cites no evidence that he contemporaneously knew of Scheibe and Christy's alleged efforts or their reactions during the period he alleges he experienced a hostile work environment.  The Court therefore does not consider this incident as part of Plaintiff's hostile work environment claim.

- Plaintiff also cites a section of Cramer's handwritten statement, prepared during Hall's investigation into the concerns raised in the May 4 Letter, which states that after Cramer befriended Patton and Plaintiff, Talbert stopped training him even though he was not ready to work on his own and told him he needed to watch who he hung out with.  Plaintiff cites no evidence that he was contemporaneously aware of this interaction during the period he alleges he experienced a hostile work environment.  The Court therefore does not consider this incident.

- Plaintiff references a statement from Hall's handwritten notes from her interview with Llamas, which reflect that Llamas stated that it "feels like" Scheibe and Christy "only watch people of color."[72]  Plaintiff does not cite evidence that he contemporaneously knew of Llamas's interview statement itself.  But Plaintiff and Llamas both signed the May 4 Letter, which raised the same concern by referencing "[i]ncidences such as

---

[71] *Id.* at 249.

[72] *Id.* at 264.

watching the only minorities on the team from a distance."[73]  Given that shared

written complaint, the Court considers this evidence.

- Plaintiff cites Hall's handwritten notes from her interview with Scheibe, in which

   Scheibe stated that Plaintiff "makes comments when he is upset—he blames it on his

   brown skin."[74]  Plaintiff does not cite evidence that he was aware of this statement at

   the time he alleges he experienced a hostile work environment.  Because this

   statement appears only in Hall's interview notes and there is no evidence that it was

   communicated to Plaintiff contemporaneously, the Court does not consider it.

- Plaintiff points to portions of McConnaughey's deposition testimony, in which she

   testified that Talbert drove a truck to Defendant's Topeka facility with an American

   flag affixed on one side and a Confederate flag affixed on the other, and that on one

   occasion in 2018, Talbert brought a firearm to work and was "waving it around at

   lunch."[75]  Plaintiff cites no evidence that he was contemporaneously aware of either

   incident during the period he alleges he experienced a hostile work environment.  The

   Court therefore does not consider this evidence as part of Plaintiff's hostile work

   environment claim.

- Finally, Plaintiff further cites McConnaughey's deposition testimony that, in

   November 2022, she witnessed Estrella tell Plaintiff and Marciel that they were "lazy

   spics."[76]  Because this comment was directed at Plaintiff, it reflects conduct Plaintiff

---

[73] Doc. 38-16 at 2.

[74] Doc. 44 at 259.

[75] *Id.* at 96 (McConnaughey Dep. 33:18–25).

[76] *Id.* at 110 (McConnaughey Dep. 86:25–87:2).

would have contemporaneously experienced and been aware of.  The Court therefore considers this incident in evaluating Plaintiff's hostile work environment claim.

Accordingly, in evaluating Plaintiff's hostile work environment claim, the Court considers only those incidents reflecting conduct Plaintiff knew about during the period he alleges he experienced a hostile work environment.  Those incidents are: (1) the questioning of Plaintiff's break time during the March 2022 break-use investigation; (2) McConnaughey's account of Talbert's comments directed at Plaintiff about the border wall and Plaintiff's political views; (3) Talbert's comments about being part of a "brotherhood";[77] (4) Talbert's comment that Plaintiff should pay for Talbert's gas because of Plaintiff's political vote; (5) Talbert's statement that Plaintiff should have to pay for the border wall; (6) Talbert's "let's go outside" comment directed at Gibson;[78] (7) the concern raised in the May 4 Letter referencing "[i]ncidences such as watching the only minorities on the team from a distance;"[79] and (8) McConnaughey's testimony that, in November 2022, Estrella directed a racial slur at Plaintiff and Marciel.  The Court does not consider the remaining incidents Plaintiff cites through Anderson's complaint, other employees' statements, or McConnaughey's deposition testimony because Plaintiff identifies no evidence that he had contemporaneous knowledge of those incidents during the relevant period.

## 2.  Timeliness

Having determined the scope of Plaintiff's hostile work environment claim, the Court turns next to whether it is untimely because Plaintiff has not identified any act contributing to the alleged hostile work environment that occurred within 300 days before he filed his administrative charge.  "In states with a state agency that has authority over employment

---

[77] *Id.* at 257.

[78] *Id.*

[79] Doc. 38-16 at 2.

discrimination claims, including Kansas, employees have up to 300 days to file an EEOC charge if they first file a charge with the state agency."[80]  This requirement exists because "Title VII is not intended to allow employees to dredge up old grievances."[81]  "Unlitigated bygones are bygones."[82]  Claims that fall outside the 300 days are therefore time-barred.[83]

Discrete claims of discrimination or retaliation occur on the day the act happened, and that must fall within the 300-day period to be actionable.[84]  But "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"[85]  Accordingly, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."[86]  In other words, there must be a related series of events, and at least one of those events must fall within the 300-day period before Plaintiff filed his EEOC charge.[87]  "[T]he obligation to demonstrate timeliness in filing a charge is a condition precedent to suit and thus a burden for plaintiffs to carry."[88]

Here, Plaintiff filed his charge of discrimination with the EEOC and the KHRC on February 2, 2023.  Three hundred days before that date is April 8, 2022.  Accordingly, to assert a timely hostile work environment claim, Plaintiff must identify harassment occurring on or after

---

[80] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012).

[81] *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005).

[82] *Id.*

[83] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

[84] *Id.* at 110–13.

[85] *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).

[86] *Id.* at 122.

[87] *See Duncan*, 397 F.3d at 1309–10.

[88] *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1167 (10th Cir. 2007).

April 8, 2022. Acts occurring before April 8, 2022 may be considered only if they are part of the same unlawful employment practice as at least one act within the limitations period.[89]

The record reflects only one alleged act occurring on or after April 8, 2022: McConnaughey's testimony that, in November 2022, Estrella directed a racial slur at Plaintiff and Marciel. The break-time incident occurred in late March 2022, and Plaintiff received a documented verbal warning on April 6, 2022—two days outside the limitations period. Talbert's comments directed at Plaintiff about the border wall and Plaintiff's political views are reflected in McConnaughey's March 29, 2022 written statement, indicating it occurred no later than that date—also outside the limitations period. Furthermore, Plaintiff does not identify when Talbert told him he should pay for Talbert's gas because of Plaintiff's political vote or when Talbert referenced a "brotherhood."[90] Plaintiff discussed the "let's go outside" incident during his May 11, 2022 interview with Hall, but the record indicates that event occurred several years before the interview.[91] Plaintiff also testified that Talbert told him he should have to pay for the border wall, but Plaintiff does not identify when Talbert made that statement. And although the May 4 Letter includes the "watching the only minorities" allegation, the letter itself does not identify when that conduct occurred or point to any specific incident on or after April 8, 2022.[92] In short, Plaintiff has not shown that any of the spring 2022 incidents occurred within the limitations period, and the only timely act he identifies is Estrella's use of a racial slur in November 2022.

Because Plaintiff has identified at least one act within the limitations period, the timeliness inquiry turns on whether the pre-April 8, 2022 incidents Plaintiff relies on are

---

[89] *See Morgan*, 536 U.S. at 122.

[90] Doc. 44 at 257.

[91] *Id.*

[92] Doc. 38-16 at 2.

sufficiently related to the November 2022 Estrella incident to be considered part of the same unlawful employment practice.[93]  Thus, the Court will first determine whether the pre-April 8, 2022 incidents are sufficiently related to the November 2022 incident to fall within the same hostile work environment.  Once the scope of the claim is determined, the Court will then evaluate the merits of Plaintiff's hostile work environment claim based on the conduct that is not time-barred.

"To determine whether these acts are part of the same hostile work environment, *Morgan* advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts."[94]  Although uniformity of "type, frequency, and perpetrator" is not a "per se requirement," the acts must be "sufficiently related to constitute the same employment practice."[95]

Applying this standard here, no jury could reasonably conclude that the pre-April 8, 2022 incidents and Estrella's use of a racial slur in November 2022 are part of the same hostile work environment.  As to type, the pre-April 8, 2022 incidents involve the questioning of Plaintiff's break usage during the March 2022 break-use investigation, Talbert's political comments to Plaintiff, and the concern raised in the May 4 Letter that certain fourth-shift co-workers were watching the only minorities on the shift to get them in trouble.  By contrast, the November 2022 incident involves a supervisor's use of a racial slur directed at Plaintiff.

As to frequency, the pre-April 8 incidents for which Plaintiff can identify an approximate date are clustered in late March and early April 2022.  Plaintiff does not identify a continuing series of race-based acts in the months that followed.  Instead, the only act he points to after April 8, 2022 is Estrella's use of a racial slur in November 2022, and the record reflects that this

---

[93] *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1309–10 (10th Cir. 2005).

[94] *Id.* at 1309 (citing *Morgan*, 536 U.S. at 120).

[95] *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1140, 1143 (10th Cir. 2008).

occurred only once.  The roughly seven-month gap between the pre-April 8, 2022 events and the

November 2022 incident undermines any inference that these acts were part of one ongoing

hostile work environment.

As to the perpetrators, the pre-April 8, 2022 conduct centers on Plaintiff's fourth-shift co-

workers—particularly Talbert, and also Christy, Scheibe, and Neff.  By contrast, the November

2022 incident involves a different actor altogether: Estrella, a supervisor.  Plaintiff identifies no

evidence that Estrella was involved in, aware of, or connected to the pre-April 8, 2022 conduct

Plaintiff attributes to Talbert, Christy, Scheibe, and Neff, or that Estrella otherwise contributed to

the earlier incidents Plaintiff cites.

Accordingly, no reasonable jury could find that Estrella's November 2022 use of a racial

slur is sufficiently related in type, frequency, or perpetrator to the pre-April 8, 2022 incidents.

Those pre-April 8, 2022 incidents are therefore time-barred.

### 3.  Merits of Timely Racially Hostile Work Environment Claim

Having concluded that the pre-April 8, 2022 incidents are time-barred, the Court next

evaluates whether the November 2022 incident involving Estrella, standing alone, is sufficient to

establish a racially hostile work environment.  Title VII makes it unlawful for an employer to

discharge or discriminate against an employee based on his race, color, or national origin.[96]

"This includes an employee's claims of a hostile work environment based on race."[97]  To survive

summary judgment on a claim alleging a hostile work environment based on race, Plaintiff "must

show that a rational jury could find that the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

---

[96] 42 U.S.C. § 2000e-2(a).

[97] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).

the victim's employment and create an abusive working environment" and that Plaintiff "was targeted for harassment because of [his] race."[98]  "The applicable test for a hostile work environment has both objective and subjective components."[99]  The Court must consider "both whether [Plaintiff] was offended by the work environment and whether a reasonable person would likewise be offended."[100]  Both must be proved.[101]  In determining whether a work environment is hostile, courts look at factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[102]

Plaintiff's claim falls far short of meeting that standard.  The Tenth Circuit has "repeatedly held that, in establishing a hostile-work-environment claim, plaintiffs must do more than point to 'sporadic racial slurs'; they must present evidence of 'a steady barrage of opprobrious racial comments.'"[103]  Here, as discussed above, the only timely incident Plaintiff identifies is Estrella's use of a racial slur directed at Plaintiff, and the record reflects that this was an isolated incident that did not recur.  As the Tenth Circuit has reasoned, Estrella's "singular racial epithet could have no more than minimal polluting effect, and it certainly falls 'far short' of establishing [Plaintiff's] hostile-work-environment claim."[104]  Accordingly, the Court grants Defendant's motion for summary judgment on Count II.

---

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[103] *Young v. City of Idabel*, 721 F. App'x 789, 801 (10th Cir. 2018) (first citing *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994); and then citing *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1223 (10th Cir. 2015)).

[104] *Id.* (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)).

## C.  Count III – Retaliation

In Count III, Plaintiff alleges that Defendant retaliated against him for engaging in protected opposition to race discrimination by temporarily transferring him to the third shift and later terminating his employment.  Title VII makes it unlawful to retaliate against an employee because the employee opposed an employment practice made unlawful by Title VII, or because the employee "participated . . . in an investigation, proceeding, or hearing."[105]  To prevail on a Title VII retaliation claim, Plaintiff "may offer direct evidence that retaliation played a 'motivating part' in the adverse employment decision."[106]  Alternatively, in the absence of direct evidence of retaliation, the Court assesses retaliation claims under the *McDonnell Douglas* burden-shifting framework.[107]  Again, under this framework, Plaintiff has the initial burden of establishing a prima facie case for retaliation.[108]  Then, Defendant has the burden to articulate a legitimate, non-discriminatory, and non-retaliatory reason for the adverse action.[109]  Finally, Plaintiff has the burden to show there is a genuine issue of material fact as to whether Defendant's proffered reason is pretextual.[110]

Here, Plaintiff offers no direct evidence of Defendant's retaliation.  Therefore, the *McDonnell Douglas* framework applies.  To state a prima facie Title VII retaliation claim, "[P]laintiff must show (1) that [he] engaged in protected opposition to discrimination, (2) that a

---

[105] 42 U.S.C. § 2000e-3(a).

[106] *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016).

[107] *Id.*

[108] *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017).

[109] *Id.*

[110] *Id.*

reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[111]

Plaintiff identifies two instances of protected opposition: signing the May 4 Letter and reporting the racially derogatory comment attributed to Estrella in November 2022.  Plaintiff also relies on two alleged adverse actions: his temporary transfer to the third shift and his termination. Defendant does not dispute that Plaintiff engaged in protected opposition or that Plaintiff's termination was materially adverse.  Instead, Defendant argues Plaintiff cannot establish a prima facie retaliation claim because the temporary transfer was not materially adverse and because Plaintiff cannot show a causal connection between any protected activity and his termination. The Court addresses each argument in turn.

### 1.   Materially Adverse

The Court turns first to whether Plaintiff has produced evidence that his temporary transfer to the third shift would have been materially adverse to a reasonable employee.  "An action is materially adverse if it is sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity."[112]  "While the employer's conduct need not affect the terms and conditions of employment, the inquiry is an objective one, and not based on a 'plaintiff's personal feelings.'"[113]  In addition, "reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a

---

[111] *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)).

[112] *Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 645 F. Supp. 3d 1134, 1162 (D. Kan. 2022) (citation modified).

[113] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (quoting *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009)) (citation omitted).

reasonable person in the plaintiff's position, considering 'all the circumstances.'"[114]  Consistent

with this standard, "'a mere inconvenience or an alteration of job responsibilities' will not

suffice."[115]

Plaintiff has not met his burden to produce evidence that his temporary transfer was

materially adverse.  Although Plaintiff characterizes the transfer as involuntary, the

uncontroverted facts show that Defendant *asked* Plaintiff to temporarily transfer to the third shift

to cover staffing needs and to assist with training newly hired Spanish-speaking employees, and

Plaintiff agreed.  Plaintiff has not produced evidence that the transfer was a demotion, that his

position as a production associate materially changed, or that the transfer reduced his

compensation, benefits, grade level, pay, or title, or otherwise made his work materially more

arduous.  To the contrary, the record reflects that Plaintiff was paid an additional $1.00 per hour

when assisting with training on the third shift.

Plaintiff also fails to cite evidence from which the Court could infer that the transfer

required him to "rearrange his daily life, to include making new childcare and transportation

arrangements, in addition to seeing his . . . family less," or that the "third shift operates at a much

faster pace and enjoys less freedom and discretion than fourth shift."[116]  Plaintiff's unsupported

assertions in his response brief are insufficient to satisfy his burden of production at summary

judgment.  And the uncontroverted evidence that the third and fourth shifts overlapped by

approximately 2.5 hours further undercuts Plaintiff's claim that the temporary reassignment

imposed the sort of significant disruption that would dissuade a reasonable employee from

---

[114] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

[115] *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (quoting *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004)).

[116] Doc. 42 at 36.

engaging in protected activity. At most, Plaintiff's temporary transfer reflects "a mere inconvenience or an alteration of job responsibilities."[117] Absent any other evidence of materiality, Plaintiff has not shown that his temporary transfer was materially adverse. Defendant is therefore entitled to summary judgment on Plaintiff's retaliation claim to the extent it is based on Plaintiff's temporary transfer to the third shift.

## 2. Causal Connection

The Court next turns to Defendant's argument that Plaintiff cannot establish the causal connection element of his prima facie case for retaliation based on his termination. A plaintiff may show a causal connection by presenting evidence that the "temporal proximity between protected conduct" and the materially adverse action "justif[ies] an inference of retaliatory motive."[118] "[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation," however, "a three-month period, standing alone, is insufficient."[119] Moreover, "a plaintiff who seeks to show causation [with temporal proximity evidence] still must present evidence that the decisionmakers *knew* of the protected conduct."[120] "An employer's action against an employee cannot be *because of* that employee's protected opposition unless the employer knows the employee has engaged in protected opposition."[121] "Plaintiff must therefore point to evidence that those who acted against him knew of his formal complaints."[122]

---

[117] *Reinhardt*, 595 F.3d at 1133 (quoting *Annett*, 371 F.3d at 1239).

[118] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006)).

[119] *Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1339 (10th Cir. 2025) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

[120] *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019).

[121] *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002).

[122] *Singh*, 936 F.3d at 1043.

Recall that Plaintiff relies on two instances of protected opposition: (1) signing the May 4 Letter; and (2) reporting the racially derogatory comment attributed to Estrella in November 2022. The Court addresses the causal connection between each protected act and Plaintiff's termination in turn.

With respect to the May 4 Letter, Plaintiff was notified of his termination on December 15, 2022, more than seven months after he signed the May 4 Letter. Given that lapse of time, temporal proximity is insufficient to support an inference of retaliatory motive. Plaintiff therefore must come forward with other admissible evidence from which a reasonable jury could find a causal connection between the May 4 Letter and his termination.[123]

Plaintiff argues the time gap is explained because he was temporarily working the third shift and therefore was "out of sight, out of mind" to Manager Allen, and that he was terminated only after returning to the fourth shift and becoming visible to Manager Allen again.[124] However, the record does not support a reasonable inference of causation on that theory. To

---

[123] In support of his causal-connection argument, Plaintiff contends Defendant treated attendance-point violations differently depending on whether an associate signed the May 4 Letter. Specifically, Plaintiff argues Defendant "suddenly" terminated him because he was a signer of the May 4 Letter, while not terminating non-signers who allegedly accrued more than eight points. Doc. 42 at 38. To illustrate this, Plaintiff cites McConnaughey deposition testimony that another production associate, Josh Sawyer, who did not sign the May 4 Letter, "brag[ged]" about accruing more than eight attendance points without being terminated. Doc. 44 at 100 (McConnaughey Dep. 49:8–15). Plaintiff also cites his own deposition testimony that he heard Sawyer tell someone in the locker room that he had accrued more than eight points. Id. at 65 (Plaintiff Dep. 253:2–25).

Defendant objects that these statements are hearsay. The Court agrees the testimony recounts out-of-court statements offered for their truth, but because Sawyer was an employee of Defendant and the statements appear to have been made within the scope of his employment with Defendant, they fall within the opposing-party statement exclusion under Fed. R. Evid. 801(d)(2)(D). Nonetheless, the testimony is irrelevant to causation. Plaintiff relies solely on his and McConnaughey's perceptions regarding Sawyer's attendance points, and he offers no record evidence establishing that Sawyer actually accrued more than eight points in 2022 without being terminated. Defendant, by contrast, has produced evidence reflecting that Sawyer did not accrue eight or more points in 2022 and was terminated in 2023 when he did exceed eight attendance points. Accordingly, Plaintiff's and McConnaughey's testimony about their perceptions of Sawyer's points is not probative of causation, and the Court does not consider it. Fed. R. Evid. 402; Wright–Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998) ("[W]e can consider only admissible evidence in reviewing an order granting summary judgment.").

[124] Doc. 42 at 37.

begin with, Manager Allen was not the decision-maker who terminated Plaintiff.  Rather, Plaintiff approached Manager Allen in October 2022 to inquire about his attendance points, which prompted Manager Allen to review the attendance tracker for all production associates. Even after discovering that Plaintiff had accrued more than eight attendance points, Manager Allen did not recommend that Plaintiff be terminated; instead, Manager Allen and Hall decided to give Plaintiff another chance and issued him a final written warning.  Only after Plaintiff incurred another unexcused absence on December 7, 2022 was Plaintiff suspended and recommended for termination to Velencia, Lemus, and Rios—the plant manager and human resources personnel who were the ultimate decision-makers.

On this point, Plaintiff also fails to identify evidence from which a reasonable jury could find that Velencia, Lemus, or Rios knew Plaintiff engaged in protected activity by signing the May 4 Letter when they approved his termination.  In an effort to prove such knowledge, Plaintiff relies first on Anderson's Speak Up complaint, which was emailed to Lemus with Rios carbon copied.  But Anderson's complaint does not reference the May 4 Letter at all, much less state that Plaintiff signed it.  Second, Plaintiff cites Hall's deposition testimony that Lopez Velencia, as plant manager, was "always notified of any termination or investigations that [were] happening within the plant."[125]  However, notice that an investigation was occurring does not establish knowledge that Plaintiff engaged in protected activity by signing the May 4 Letter.  As such, Plaintiff has not identified evidence from which a reasonable jury could find that Velencia, Lemus, or Rios knew Plaintiff signed the May 4 Letter when they approved his termination.

As to Plaintiff's November 2022 complaint, the record reflects that sometime in November 2022, McConnaughey witnessed Estrella refer to Plaintiff and Marciel as a racial slur,

---

[125] Doc. 44 at 136 (Hall Dep. 28:14–17).

and that Plaintiff, Marciel, and Steward Wilson reported the comment to Manager Allen shortly after it occurred. Although the record does not reflect the precise date of this report, the evidence indicates it occurred sometime in November 2022, and Plaintiff was notified of his termination on December 15, 2022. Viewing the evidence in the light most favorable to Plaintiff, that temporal proximity is sufficiently close to permit an inference of retaliatory motive at the prima facie stage. However, Plaintiff must still present some evidence that the relevant decision-makers knew of his complaint,[126] and he identifies none. Plaintiff has not produced any evidence that Velencia, Lemus, or Rios were aware of Plaintiff's report regarding Estrella's comment when they reviewed Plaintiff's attendance history and approved termination. Because Plaintiff has not produced evidence that the individuals who approved his termination knew of either protected activity, he has not established the causation element of his prima facie retaliation claim. Accordingly, the Court grants Defendant's motion for summary judgment on Count III.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 37) is **granted in part and denied in part**. Defendant's motion for summary judgment with respect to Count I is **denied**. Defendant's motion for summary judgment with respect to Counts II and III is **granted**.

**IT IS SO ORDERED.**

Dated: February 17, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[126] *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019).